Charles Wesley O'BERRY,
Petitioner-Appellee,

v.

Louie L. WAINWRIGHT, Director,
Division of Corrections,
Respondent-Appellant.

No. 75–2568.

United States Court of Appeals,
Fifth Circuit.

Feb. 11, 1977.

Rehearing and Rehearing En Banc Denied
March 10, 1977.

Robert L. Shevin, Atty. Gen., Stephen R. Koons, Harry M. Hipler, Asst. Attys. Gen., West Palm Beach, Fla., for respondent-appellant.

Daniel S. Pearson (Court-appointed), Miami, Fla., for petitioner-appellee.

Before BROWN, Chief Judge, and JONES and GOLDBERG, Circuit Judges.

JOHN R. BROWN, Chief Judge:

The State of Florida appeals from the grant of a writ of habeas corpus to Charles Wesley O'Berry (Petitioner). The writ was granted by the District Court for the Southern District of Florida on the grounds that evidence obtained as a result of an unconstitutional search of Petitioner's automobile was introduced at Petitioner's trial. Since we find that Petitioner received a full and fair consideration of his Fourth Amendment claims in the Florida state courts, we are precluded by the doctrine announced in *Stone v. Powell,* 1976, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067, from considering Petitioner's Fourth Amendment claims in a federal habeas proceeding. Accordingly, we reverse the District Court.

On the night of May 13, 1969, at approximately 9:00 p. m., Petitioner was arrested at his residence and taken to the Ft. Lauderdale Police Department, where he was charged with two counts of rape of the prosecutrix, a 17 year old girl. At the time of Petitioner's arrest, a 1961 white Falcon automobile was sitting in the driveway.[1] The arresting officer did not check the car at the time of the arrest,[2] but he "secured" it and had it towed to a police storage area.[3]

Sometime between 10:00 a. m. and 11:00 a. m. of the following day, May 14, 1969, Detective Tanner, the fingerprint technician, processed and inspected this car at the police storage area. The car was closed at this time, it was secured in a police storage area, and no search warrant had been issued to allow inspection of the car. This search revealed a milk carton container, three pig knuckle bones, three pennies behind the driver's seat, and a whisk broom. The detective also found a number of latent prints and smudges in the front seat area, none of which were those of Petitioner or of the prosecutrix. Finally, the detective determined that the backseat area had been "wiped down clean" recently.

The major portion of the State's evidence in Petitioner's rape trial was the testimony of the prosecutrix. She testified that the Petitioner forced her into the backseat of his car at gunpoint and drove her to a deserted area, where he forced her out of the car and raped her. Afterwards, Petitioner forced her into the backseat again, drove to another area, and again raped prosecutrix in the backseat. Prosecutrix testified that he then dragged her out of the car, choked her, and left her for dead.

In corroboration of the fact of the rape (which fact was uncontested at trial), the State offered proof that (i) prosecutrix reported the rape shortly after it occurred; (ii) prosecutrix had, according to the medical examiner, had intercourse within the time fixed and had bruising near the neck; and (iii) her clothes were in a dirty and disheveled condition. In corroboration of the fact it was Petitioner who had committed the rape, the State offered (i) prosecutrix's testimony identifying certain features of Petitioner's automobile which corresponded to photographs and other testimony concerning the interior of Petitioner's

---

1. The record does not disclose whether the car was locked at the time of Petitioner's arrest.

2. The arresting officer did not check the car at the time of the arrest, because he "wasn't too

interested in the vehicle at that time." R., at 227.

3. R., at 230.

automobile; and (ii) Detective Tanner's testimony that the Petitioner's automobile, searched about 36 hours after the rape (about 14 hours after Petitioner's arrest), had recently been wiped clean of fingerprints.[4] Petitioner's court-appointed counsel did not object or file a motion to suppress Detective Tanner's testimony. Counsel also engaged in extensive cross-examination of the witness.

Petitioner took the stand and testified that he had dated the prosecutrix before the night in question and that she had been in his car on prior occasions.[5] Petitioner also used an alibi defense and testified that he was not with the prosecutrix on the night in question. Thus, the testimony of Detective Tanner that the backseat of Peti-

tioner's automobile had recently been wiped clean was the *only* evidence which corroborated prosecutrix's testimony that Petitioner was the man who had raped her on the night in question.

The jury returned a verdict of guilty on both counts and the state trial judge sentenced Petitioner to a total of 150 years on both counts.

### Petitioner's State Appeals

Although Petitioner did not appeal his conviction,[6] he filed three separate Motions to Vacate Judgment and Sentence under Florida Criminal Procedure Rule 1.850,[7] which is a Florida counterpart of the federal § 2255 post-conviction remedy. In two of the three Petitioner's Rule 1.850 motions, he

---

**4.** During final argument to the jury, the State used Detective Tanner's testimony to argue that Petitioner, after the rapes, wiped down the backseat of the car in order to get rid of incriminating evidence. R., at 397.

**5.** This testimony, if believed by the jury, would explain prosecutrix's ability to identify certain features of the interior of Petitioner's automobile.

**6.** Petitioner's trial counsel unilaterally made the decision not to appeal, because he felt that the case had no merit. He did not tell anyone, including Petitioner, of his failure to file a notice of appeal or an appeal. Years after Petitioner's conviction, Petitioner was given an evidentiary hearing by the Florida courts on the question of whether or not Petitioner's right to appeal was frustrated by state action. Since Petitioner's trial counsel was court-appointed, the State Court determined that Petitioner's right to appeal *was* frustrated by state action, so that Petitioner was entitled to a belated, out-of-time state habeas review of his conviction. *See* discussion, at note 4, *supra.*

**7.** Rule 1.850 provides:

A prisoner in custody under sentence of a court established by the Laws of Florida claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or Laws of the United States, or of the State of Florida, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

A motion for such relief may be made at any time.

Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the prosecuting attorney of the court, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto. If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or is otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

A court may entertain and determine such motion without requiring the production of the prisoner at the hearing.

The sentencing court shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner.

An appeal may be taken to the appropriate appellate court from the order entered on the motion as from a final judgment on application for a writ of habeas corpus.

An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this rule, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the

contended, among others, that his Constitutional rights had been violated when evidence of the allegedly illegal search and seizure of his automobile had been allowed into evidence at his trial. Each of the three motions were filed before the same State Court Trial Judge who had presided at Petitioner's rape trial. Each motion was denied without an evidentiary hearing, the Judge asserting in each case that "the Court [has] reviewed and found no substantial matter or question which would require further review * * *."

After the denial of the third of Petitioner's Rule 1.850 motions by the Trial Judge who had sentenced him, Petitioner filed the first of his state habeas petitions in the Fourth District Court of Appeals of Florida. In his petition (as in some of the previous Rule 1.850 motions filed with the Trial Court), Petitioner alleged not only that his Fourth Amendment rights had been violated, but also that a variety of other rights had been violated, including his right to take a direct appeal.[8] After consideration of Petitioner's contentions, the state appellate court ordered a remand for an evidentiary hearing before a different Trial Judge, the hearing to resolve the question of "Whether or not Petitioner's right to appeal was frustrated by state action."

In the course of this evidentiary hearing, at which Petitioner was represented by new court-appointed counsel, most of the evidence centered on whether or not Petitioner's first court-appointed counsel had frustrated Petitioner's right to take a direct appeal and, if so, whether that constituted state action. Petitioner was allowed to list (but not argue) the contentions he had previously and unsuccessfully raised in his prior Rule 1.850 motions. In this evidentiary hearing, the Judge entered an order finding that Petitioner's right to appeal had been frustrated by state action and that he was therefore entitled to full appellate review. After full consideration of the Trial Judge's findings and order, the State District Court of Appeals granted Petitioner the opportunity "in this habeas corpus proceeding for full appellate review by this Court of the judgment and sentence of the [Trial Court], on authority of *Hollingshead v. Wainwright*, Fla.1967, 194 So.2d 577 * *."

For the first time, Petitioner was given the chance in his brief and in oral argument before the District Court of Appeals to argue fully that his Fourth Amendment rights had been violated by the warrantless search and seizure of Petitioner's automobile and that the introduction of evidence from such search at his trial was plain error.[9]

After considering all of the issues raised by Petitioner in his brief and in oral argu-

remedy by motion is inadequate or ineffective to test the legality of his detention.

**8.** *See* note 6, *supra.*

**9.** In this appeal, Petitioner was represented, for the first time, by the able court-appointed counsel who represents him before us and who represented him before the United States District Court. A short perusal of Petitioner's state court brief indicates that the Fourth Amendment claim was argued carefully and completely.

The Fourth Amendment claim was the first one argued by Petitioner, thus revealing the great emphasis he put upon this point before the state appellate court. After recounting the facts of the case (which were undisputed by the State), Petitioner argued that "We need go no further than a reading of *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564, to conclude that the search of the vehicle in the instant case clearly violated

the Defendant's rights under the Fourth Amendment to the United States Constitution." (R.I. at 60). After discussing the facts and opinion in *Coolidge*, Petitioner concluded that the "facts of the instant case and the facts of *Coolidge* are indistinguishable. The evidence derived from the search here was critical—if, indeed, as the Defendant contended, the victim had previous to the night in question been in his car, then even were her fingerprints found, their existence could be explained. But here the testimony was that all prints had been recently wiped. Clearly, a jury could have inferred therefrom that had the Defendant been truthful that he had known the victim before, no wiping would have occurred. Had the Defendant not testified, a freshly wiped automobile, in light of other apparent sloppiness, might have raised an eyebrow—but in light of his testimony, the recent wiping was critical

ment, the court denied his petition in *O'Berry v. Wainwright*, Fla.App., 1974, 300 So.2d 740:

"Upon careful review of the record, briefs of counsel and argument in this cause we are of the opinion that no reversible error has been demonstrated and the judgment and conviction should be affirmed. Although this matter has proceeded for full appellate review by way of habeas corpus under the authority of *Hollingshead v. Wainwright*, Fla.1967, 194 So.2d 577, we are not convinced that the record demonstrates that petitioner's right to appeal was frustrated by state action. Nonetheless, each of the matters assigned as error were analyzed and considered and found to be without merit. Of particular significance is the fact that none of the critical contentions of the petitioner were brought before the trial court by a proper and timely objection; consequently, they have not been preserved for appellate review. *State v. Barber*, Fla., 301 So.2d 7, opinion filed June 12, 1974; *Simpson v. State*, Fla.App. 1968, 211 So.2d 862; *New v. State*, Fla. App.1968, 211 So.2d 35; *Dodd v. State*, Fla.App.1970, 232 So.2d 235; *State v. Jones*, Fla.1967, 204 So.2d 515; 2 Fla.Jur., Appeals, sec. 68; Rule 3.190(h), FRCrP. Except where fundamental error is involved, and we find none to exist here) it is essential that a defendant properly and timely object to the introduction of evidence in order to preserve his objection for appellate review. *Simpson v. State*, supra.

Accordingly, finding no reversible error, the judgment of conviction and sentence is affirmed."

Having exhausted his state remedies, Petitioner filed this Federal Habeas Corpus

. . . . The admission of all evidence derived from the search of the Defendant's vehicle was plain error." (R. I, at 62–63).

The persuasiveness of Petitioner's new court-appointed counsel on the Fourth Amendment point is revealed by his success, using the same argument, before the Federal District Court, which vacated the Petitioner's conviction on

petition in the District Court for the Southern District of Florida, this time alleging only that the warrantless search and seizure violated his Fourth Amendment rights and that he had been denied his Sixth Amendment right to effective assistance of counsel. The District Court found that Petitioner's Sixth Amendment right to effective assistance of counsel had not been violated, but that his Fourth Amendment right to be free from warrantless searches and seizures had been violated, basing its opinion on the latter point primarily on *Coolidge v. New Hampshire*, 1971, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564. Accordingly, the District Court ordered the State of Florida either to re-try Petitioner within a reasonable time or to release him. The State of Florida thereupon appealed the District Court's grant of habeas corpus to Petitioner. Because Petitioner filed no cross-appeal, only the question of whether Petitioner's Fourth Amendment rights were violated is now before this Court.

### Full And Fair State Hearing

In *Stone v. Powell*, 1976, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067, the Supreme Court held that "where the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 482, 96 S.Ct. at 3046, 49 L.Ed.2d at 1080. Whether or not we will even consider affirming the grant of habeas relief by the District Court thus depends on whether or not the State "provided an opportunity for full and fair litigation" of Petitioner's Fourth Amendment claim. If it did, the matter ends there, and we must reverse the District

the ground that the admission into testimony of the warrantless search and seizure of Petitioner's car was plain error. Of particular interest is the fact that, in delivering its ruling, the District Court relied primarily on *Coolidge*, and adopted essentially the same reasoning as Petitioner suggested in his well-argued state and federal briefs.

Court. If it did not, then our analysis is only begun, and we must inquire further whether or not the petition should be granted on the merits of this case.[10]

The difficulty presented by the facts of this case is that, for whatever reason—waiver, deliberate bypass, or mere oversight by Petitioner's court-appointed state trial counsel—Petitioner's Fourth Amendment claims were never raised during trial because Petitioner failed to object, and no direct appeal was ever taken from Petitioner's conviction. An additional complicating factor is that, although the Fourth Amendment claim was presented to the Trial Judge through two of Petitioner's Rule 1.850 motions, the Judge denied the motions without an evidentiary hearing and without making findings of fact and conclusions of law. The final complication is that, although the Florida District Court of Appeals gave full consideration to the Fourth Amendment claims, its denial of those claims was grounded in large part on Petitioner's failure to object to the introduction of Detective Tanner's testimony at trial.

■ Petitioner argues that the "full and fair consideration" requirement in *Stone* means, at the very least, consideration by both the state trial court and the state appellate court. Here, Petitioner argues, the facts simply do not support a finding

that he received full and fair trial court consideration of his Fourth Amendment claims. Petitioner also argues that the state appellate court did not give full consideration to his Fourth Amendment claims. Pointing to the language in the appellate court opinion which purports to reject Petitioner's Fourth Amendment claims on the ground that they were not preserved by timely objection, Petitioner argues that the appellate court did not deny his petition on Fourth Amendment grounds, but on due process considerations concerning the fairness of the trial. Under Petitioner's theory, *Stone* does not preclude us from considering his Fourth amendment claims under these circumstances. Petitioner's final argument[11] is that *Stone* should not be applied retroactively to this case, since Petitioner was tried and convicted five years (and the federal habeas hearing and order one year) before the *Stone* decision was handed down.

Our analysis must begin with the determination of what the Supreme Court meant by "opportunity for full and fair consideration" of Fourth Amendment claims by state courts—a task not made easier by the Court's failure to define that term in *Stone*. Petitioner contends (and finds some support for his contention in *Stone, supra*, 428 U.S. at 494 n. 36, 96 S.Ct. at 3052 n. 36, 49 L.Ed.2d at 1088 n. 36) that *Townsend v.*

---

**10.** In *Petillo v. New Jersey*, D.N.J., 1976, 418 F.Supp. 686, the Court granted habeas relief to a petitioner who had raised Fourth Amendment claims, because the State of New Jersey not only did not give petitioner an opportunity for a full and fair hearing of his Fourth Amendment claims, but it failed to do so by fashioning a procedural rule which automatically deprived State prisoners from raising and litigating certain Fourth Amendment claims in state courts:

"New Jersey has fashioned a rule which deprives all defendants of a state forum 'for the full and fair litigation' of such Fourth Amendment claims. That rule was announced on the direct appeal of one of the petitioners now before the Court. . . . Under the Petillo Rule the subject of a search is simply not entitled to litigate his federal claim—that evidence seized pursuant to a warrant procured by police perjury ought to be suppressed—in state court. Whatever his rights to sue later under the Civil Rights Act or to seek subsequent criminal prosecution of offi-

cers who have perjured themselves, and however effective these supposed remedies may be, the injured defendant still has a constitutional right to suppress the fruits of the search. . . . Stone does not diminish this right, but only the circumstances under which it may be claimed on collateral review. New Jersey thus effectively denies the subject of the search the right to suppress for fruits of warrants procured by perjury by denying him a hearing on the veracity of the underlying affidavit—no matter how compelling his preliminary showing of perjury may be." *Id.*, at 688–89.

**11.** We reject as without merit Petitioner's claim that the State's alleged prior failure to question in either the District Court or this Court the right of the District Court to review by habeas corpus the Petitioner's Fourth Amendment claim precludes the State from now relying upon *Stone*.

*Sain*, 1963, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770, provides a working definition of what constitutes an opportunity for "full and fair consideration" by the state courts. Although we agree that *Townsend* is of some help in defining "full and fair adjudication" by a state court, we cannot, as Petitioner desires, endorse its wholesale use in determining whether or not a federal court should hear Petitioner's Fourth Amendment claim in a habeas corpus proceeding.

In *Townsend*, the Court held only that a federal court must grant an *evidentiary* hearing to a habeas applicant seeking to obtain release from a state court conviction when the applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or during a collateral proceeding. The Court went on to say that the applicant had not received a full and fair evidentiary hearing, thus requiring the federal habeas court to hold a new evidentiary hearing, where

> "(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing."

*Townsend, supra,* 372 U.S. at 313, 83 S.Ct. at 757, 9 L.Ed.2d at 786.

Thus, *Townsend* technically applies only in determining whether a state court has granted Petitioner a full and fair evidentiary hearing—a hearing limited to findings of fact. *Townsend* emphasizes that although

> "the district judge may, where the state court has reliably found the relevant facts, defer to the state court's findings of fact, he may not defer to its findings of law. It is the district judge's duty to apply the applicable federal law to the

state court fact findings independently. The state conclusions of law may not be given binding weight on habeas. That was settled in *Brown v. Allen*, supra (344 U.S. [443] at 506, 73 S.Ct. [397] at 445 [97 L.Ed. 469]) (opinion of Mr. Justice Frankfurter)."

*Townsend, supra,* 372 U.S. at 318, 83 S.Ct. at 760, 9 L.Ed.2d at 789. Where factual issues are in dispute, *Townsend* would provide a relatively clear formula for determining whether full and fair consideration of a fact issue has been afforded by the state courts. Where, however, the issues in dispute are legal only, the *Townsend* test loses much of its usefulness.

The second factor limiting the usefulness of the *Townsend* formula concerns the use to which the test is put. In *Townsend*, the District Court already had jurisdiction to consider the habeas petition of the state prisoner. The question before the Court was not whether it had the power to consider the Petitioner's claims at all, but whether or not the state court had afforded the Petitioner a full and fair hearing on the factual issues underlying his present constitutional claims. If the question is answered in the affirmative, then Petitioner will not be denied relief. All that will happen is that the federal court must accept the state court's findings of fact when ruling on Petitioner's claims.

In *Stone*, on the other hand, the answer to the question of whether the state has given the Petitioner a full and fair hearing has a much more drastic and far-reaching effect. Although the Court in *Stone* stopped short of saying that its decision was a limitation on federal court jurisdiction, *see Stone, supra,* 428 U.S. at 494 n. 37, 96 S.Ct. at 3052 n. 37, 49 L.Ed.2d at 1088 n. 37, the effect of finding full and fair consideration by the state courts of petitioner's Fourth Amendment claims is to prevent the exercise of federal court power altogether—a much more drastic result than that which is the result of the verbally similar finding made by a federal court under the *Townsend* formula. Despite the assertions of the Supreme Court in *Stone* to the con-

trary, we would be blind to reality to pretend that the practical effect of that decision is not a limitation on federal court jurisdiction.

Under these circumstances, it would be rash indeed for us to borrow wholesale the *Townsend* formula for use in the *Stone* situation, simply because the wording of the formulas used in each case is similar. However, with these caveats in mind, we see no need to ignore the *Townsend* standard when it may shed some light on the problem at hand.[12]

■ Having determined that *Townsend* is not the sole appropriate test for determining what "full and fair" consideration of Fourth Amendment claims by state courts means, we must look to *Stone* for clues as to the content of that requirement.

The first clue *Stone* provides is an ambiguous one. The opinion talks in some places of an opportunity for full and fair consider-

---

**12.** Thus, the usefulness of the following discussion from *Townsend* is not diminished by the warnings mentioned above:

There cannot even be the semblance of a full and fair hearing unless the state court actually reached and decided the issues of fact tendered by the defendant. Thus, if no express findings of fact have been made by the state court, the District Court must initially determine whether the state court has impliedly found material facts. No relevant findings have been made unless the state court decided the constitutional claim tendered by the defendant on the merits. If relief has been denied in prior state collateral proceedings after a hearing but without opinion, it is often likely that the decision is based upon a procedural issue—that the claim is not collaterally cognizable—and not on the merits. On the other hand, if the prior state hearing occurred in the course of the original trial—for example, on a motion to suppress allegedly unlawful evidence, as in the instant case—it will usually be proper to assume that the claim was rejected on the merits.

If the state court has decided the merits of the claim but has made no express findings, it may still be possible for the District Court to reconstruct the findings of the state trier of fact, either because his view of the facts is plain from his opinion or because of other indicia. In some cases this will be impossible, and the Federal District Court will be compelled to hold a hearing.

Reconstruction is not possible if it is unclear whether the state finder applied correct constitutional standards in disposing of the claim. Under such circumstances the District Court cannot ascertain whether the state court found the law or the facts adversely to the petitioner's contentions. Since the decision of the state trier of fact may rest upon an error of law rather than an adverse determination of the facts, a hearing is compelled to ascertain the facts. Of course, the possibility of legal error may be eliminated in many situations if the fact finder has articulated the constitutional standards which he has applied. Furthermore, the coequal responsibilities of state and federal judges in the administration of federal constitutional law are such that we think the district judge may, in the ordinary case in which there has been no articulation, properly assume that the state trier of fact applied correct standards of federal law to the facts, in the absence of evidence, such as was present in *Rogers v. Richmond,* that there is reason to suspect that an incorrect standard was in fact applied. Thus, if third-degree methods of obtaining a confession are alleged and the state court refused to exclude the confession from evidence, the district judge may assume that the state trier found the facts against the petitioner, the law being, of course, that third-degree methods necessarily produce a coerced confession.

In any event, even if it is clear that the state trier of fact utilized the proper standard, a hearing is sometimes required if his decision presents a situation in which the "so-called facts and their constitutional significance [are] so blended that they cannot be severed in consideration." *Rogers v. Richmond,* supra (365 U.S. [534] at 546, 81 S.Ct. [735], at 742 [5 L.Ed.2d 760]). See *Frank v. Mangum,* supra (237 U.S. [309] at 347, 35 S.Ct. [582], at 595 [59 L.Ed. 969]) (Holmes, J., dissenting). Unless the district judge can be reasonably certain that the state trier would have granted relief if he had believed petitioner's allegations, he cannot be sure that the state trier in denying relief disbelieved these allegations. If any combination of the facts alleged would prove a violation of constitutional rights and the issue of law on those facts presents a difficult or novel problem for decision, any hypothesis as to the relevant factual determinations of the state trier involves the purest speculation. The federal court cannot exclude the possibility that the trial judge believed facts which showed a deprivation of constitutional rights and yet (erroneously) concluded that relief should be denied. Under these circumstances it is impossible for the federal court to reconstruct the facts, and a hearing must be held.

*Townsend, supra,* 372 U.S. at 313–16, 83 S.Ct. at 757–758, 93 L.Ed.2d at 786–87.

ation of Fourth Amendment claims by both the state trial and appellate courts. *See Stone, supra,* 428 U.S. at 489, 490, 493, 494, n. 37, 96 S.Ct. at 3049, 3050, 3051, 3052, n. 37, 49 L.Ed.2d at 1085, 1086, 1087, 1088, n. 37. In others, the opinion talks only in general terms of the State providing an opportunity for full and fair litigation of a Fourth Amendment claim. The initial question presented, therefore, is whether or not "an opportunity for full and fair consideration" requires consideration at both the state trial and state appellate court level, or whether it requires consideration by only one level of state courts. Consistently with the ambiguity of the Supreme Court's opinion, we conclude that sometimes "full and fair consideration" means consideration by two tiers of state courts—sometimes it requires consideration by only one.

We conclude that where there are *facts* in dispute, full and fair consideration requires consideration by the fact-finding court, and at least the availability of meaningful appellate review by a higher state court. Where, however, the facts are undisputed, and there is nothing to be served by ordering a new evidentiary hearing, the full and fair consideration requirement is satisfied where the state appellate court, presented with an undisputed factual record, gives full consideration to defendant's Fourth Amendment claims. Such a distinction makes practical sense because it ensures that a criminal defendant is given a full hearing on his Fourth Amendment claims and the facts underlying those claims at least once at the state level, but it does not require the State to hold evidentiary hearings which would be useless and inefficient. This distinction is consistent also with the rationales underlying both *Townsend* and *Stone.* As discussed above, *Townsend's* major concern was with evidentiary hearings and the distinction we provide today preserves and protects that concern. The distinction is consistent with *Stone* because it protects and furthers the federal-state court harmony deemed so important in *Stone* [13] while ensuring the fullest possible state court consideration of Fourth Amendment claims consistent with efficiency and the avoidance of wasted judicial time and effort.

Second, *Stone* only requires that the State provide an *opportunity* for full and fair adjudication of Fourth Amendment claims. Thus, if Petitioner deliberately bypassed [14] state procedures for making his

13. A possible argument could be made that *Stone* requires two tiers of state court consideration of Fourth Amendment claims in order to provide a check on the arbitrary exercise of power by a single state judge. A careful reading of *Stone* does not support this reasoning, however, since it is obvious that the Supreme Court, whatever its views may have been in the past, is now confident that state judges are as capable of protecting federal constitutional rights as are federal judges. *See Stone, supra,* at 493 n. 35, 96 S.Ct. at 3051 n. 35, 49 L.Ed.2d at 1087 n. 35.

14. The State has argued before us that the Supreme Court's decision in *Francis v. Henderson,* 1976, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149, precludes us from granting habeas relief when the evidence obtained as a result of the search was introduced into evidence without objection by petitioner, regardless of the reason for Petitioner's failure to object. In *Francis,* the Court extended the rule in *Davis v. United States,* 1973, 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216, to state prisoners by holding that, where a state requires a criminal defendant to make timely challenge to the com-position of the grand jury which indicted him, and where the defendant failed to make such objection he could not, after his conviction, bring a challenge to the grand jury in a federal habeas corpus proceeding, absent (i) a showing of cause for his failure to challenge, and (ii) a showing of actual prejudice. In light of our disposition of this case on other grounds, we need not consider this argument by the State. In particular, we need not and do not draw any conclusions here as to the extent that *Francis* has overruled *Fay v. Noia,* 1963, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837; or *Henry v. Mississippi,* 1965, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408. We also make no predictions as to whether the rule in *Francis* is limited to grand jury situations or whether it extends to other constitutional rights. *But see Francis, supra,* 425 U.S. at 539 n. 4, 96 S.Ct. at 1710 n. 4, 48 L.Ed.2d at 161 n. 4 (Brennan, J., dissenting). Finally, we make no ruling on whether, or to what extent, the show cause requirement of *Francis* is satisfied by a showing by Petitioner that he has not deliberately bypassed state procedures, as required by *Fay.*

Fourth Amendment objections known or if he knowingly waived his Fourth Amendment objections, then a federal District Court would be precluded from granting habeas corpus relief on Fourth Amendment grounds despite the fact that no state hearing was in fact held on Petitioner's claims. *Stone, supra,* at 485, 96 S.Ct. at 3047, 49 L.Ed.2d at 1082.

█ The third clue provided by *Stone* is the Court's general conclusion that the costs [15] of the exclusionary rule generally outweigh its benefits: [16]

"We adhere to the view that these considerations support the implementation of the exclusionary rule at trial and its enforcement on direct appeal of state court convictions. But the additional contribution, if any, of the consideration of search-and-seizure claims of state prisoners on collateral review is small in relation to the costs. To be sure, each case in which such claim is considered may add marginally to an awareness of the values protected by the Fourth Amendment.

There is no reason to believe, however, that the overall educative effect of the exclusionary rule would be appreciably diminished if search-and-seizure claims could not be raised in federal habeas corpus review of state convictions. Nor is there reason to assume that any specific disincentive already created by the risk of exclusion of evidence at trial or the reversal of convictions on direct review would be enhanced if there were the further risk that a conviction obtained in state court and affirmed on direct review might be overturned in collateral proceedings often occurring years after the incarceration of the defendant. The view that the deterrence of Fourth Amendment violations would be furthered rests on the dubious assumption that law enforcement authorities would fear that federal habeas review might reveal flaws in a search or seizure that went undetected at trial and on appeal. Even if one rationally could assume that some additional incremental deterrent effect would be present in isolated cases, the resulting

---

**15.** As the opinion in *Stone* emphasizes, resort to habeas corpus "results in serious intrusions on values important to our system of government" apart from the additional costs imposed by the exclusionary rule. These values include: "(i) the most effective utilization of limited judicial resources, (ii) a necessity of finality in criminal trials, (iii) the minimization of friction between our federal and state systems of justice, and (iv) the maintenance of the constitutional balance upon which the doctrine of federalism is founded." *Stone, supra,* at 491, 96 S.Ct. at 3050, 49 L.Ed.2d at 1086 n. 31, *citing Schneckloth v. Bustamonte,* 412 U.S. at 259, 93 S.Ct. 2041, 36 L.Ed.2d 854 (Powell, J., concurring); *Kaufman v. United States,* 394 U.S. 217 at 231, 89 S.Ct. 1068, 22 L.Ed.2d 227 (Black, J., dissenting); Friendly, *Is Innocence Irrelevant?* 38 U.Chi.L.Rev. 142 (1970).

In the Court's view the additional costs imposed by the exclusionary rule are staggering— "the focus of the trial, and the attention of the participants therein, is diverted from the ultimate question of guilt or innocence that should be the central concern in a criminal proceeding. Moreover, the physical evidence sought to be excluded is typically reliable and often the most probative information bearing on the guilt or innocence of the defendant." *Stone, supra,* at 489, 96 S.Ct. at 3049, 49 L.Ed.2d at 1085. The most disturbing cost of the exclusionary rule is that it "deflects the truth finding process and it

often frees the guilty. The disparity in particular cases between the error committed by the police officer and the windfall afforded a guilty defendant by application of the rule is contrary to the idea of proportionality that is essential to the concept of justice. Thus, although the rule is thought to deter unlawful police activity in part through the nurturing of respect for Fourth Amendment values, if applied indiscriminately it may well have the opposite effect of generating disrespect for the law and administration of justice." *Id.* at 490, 96 S.Ct. at 3050, 49 L.Ed.2d at 1085–86.

**16.** The benefits of the exclusionary rule are two. First, the exclusion of illegally seized evidence is supposed to prevent contamination of the judicial process. *Stone, supra,* at 484, 96 S.Ct. at 3047, 49 L.Ed.2d at 1081. As the Court emphasizes, however, standing alone, this justification carries very little weight. *Id.* at 484, 96 S.Ct. at 3047, 49 L.Ed.2d at 1082–83. The primary justification for the exclusionary rule then is the deterrence of police conduct that violates Fourth Amendment rights. *Id.* at 486, 96 S.Ct. at 3048, 49 L.Ed.2d at 1083. But as time passes between the moment of the arrest and the moment of Petitioner's final collateral federal appeal years later, the educative effect of the rule may dissolve, while the costs remain. *Id.* at 493–495, 96 S.Ct. at 3051–3052, 49 L.Ed.2d at 1087–88.

advance of the legitimate goal of furthering Fourth Amendment rights would be outweighed by the acknowledged costs to other values vital to a rational system of criminal justice."

*Stone, supra,* at 493–494, 96 S.Ct. at 3051–3052, 49 L.Ed.2d at 1087–88.

Finally, underlying the *Stone* decision is the conviction that state courts, when they consider federal constitutional rights, are as competent as federal courts to insure that those rights are protected:

"Despite differences in institutional environment and the unsympathetic attitude to federal constitutional claims of some state judges in years past, we are unwilling to assume that there now exists a general lack of appropriate sensitivity to constitutional rights in the trial and appellate courts of the several States. State courts, like federal courts, have a constitutional obligation to safeguard personal liberties and to uphold federal law. *Martin v. Hunter's Lessee,* 14 U.S. (1 Wheat.) 304, 341–344, 4 L.Ed. 97 (1816). Moreover, the argument that federal judges are more expert in applying federal constitutional law is especially unpersuasive in the context of search-and-seizure claims, since they are dealt with on a daily basis by trial judges in both systems. In sum, there is 'no intrinsic reason why the fact that a man is a federal judge should make him more competent, or conscientious, or learned with respect to the [consideration of Fourth Amendment claims] than his neighbor in the state courthouse.'"

*Stone, supra,* at 493 n. 35, 96 S.Ct. at 3051 n. 35, 49 L.Ed.2d at 1087–88 n. 35 [citation omitted].

In applying these considerations to the facts of the present case, we conclude that the State of Florida has given Petitioner the opportunity for full and fair consideration of his Fourth Amendment claims, and therefore, we are precluded from considering those claims in a federal habeas proceeding.

### The State Trial Court

Because of Petitioner's failure to object at his trial to the introduction of Detective Tanner's testimony, he received no hearing on his Fourth Amendment claims at that time. However, the facts surrounding the search were set forth in great detail and were undisputed. Our examination of the record reveals nothing which would clarify whether Petitioner's failure to object was a strategic maneuver, a deliberate bypass of State procedures for raising and preserving objections or the result of inadvertence or ignorance on the part of Petitioner and his court-appointed counsel. Under this set of facts, we conclude that the State did not provide full and fair consideration of Petitioner's Fourth Amendment claims at his trial.

### Petitioner's Rule 1.850 Motions

Neither can we conclude that the state gave Petitioner's Fourth Amendment claims full and fair consideration in his various Rule 1.850 motions. Petitioner was never given an evidentiary hearing on his claims by the State Trial Court, despite Rule 1.850's mandate that such a hearing be held. Furthermore, since the Trial Judge failed to set forth any findings of fact or conclusions of law when he denied Petitioner's Rule 1.850 motions, again in contravention of state procedural law to the contrary, we have no way of knowing the grounds on which the Judge denied the motions. The denial could have been based on the Judge's ruling on the Fourth Amendment claim, it could have been based on Petitioner's failure to object, or it might have had no basis in reason at all. We conclude that this cursory disposition of Petitioner's Rule 1.850 motions by the State Trial Court constituted neither full nor fair consideration of his Fourth Amendment claims. *See* note 12, *supra.*

### State Appellate Court Consideration

The Fourth Amendment Claim of Petitioner was exhaustively argued and briefed before the State Appellate Court. *See* note 9, *supra.* The Court, in its opinion, made

clear that "each of the matters assigned as error were analyzed and considered and found to be without merit." *O'Berry v. Wainwright, supra,* 300 So.2d at 740. However, in making its determination, the Court placed "particular significance" on the fact "that none of the critical contentions of the petitioner were brought before the trial court by a proper and timely objection; consequently, they have not been preserved for appellate review. . . . Except where fundamental error is involved, and we find none to exist here[,] it is essential that a defendant properly and timely object to the introduction of evidence in order to preserve his objection for appellate review." *O'Berry, supra,* at 740. Petitioner argues that the state appellate court did not give full and fair consideration to his Fourth Amendment claims solely because the stated grounds for that court's disposition of the Fourth Amendment claims was not on the merits of the Fourth Amendment claim, but on due process considerations concerning the fairness of the trial. We cannot agree.

■ We conclude, for several reasons, that the *Stone* "opportunity for full and fair consideration" requirement is satisfied where the state court is squarely faced with Petitioner's Fourth Amendment claim, but chooses to resolve that claim on an independent, adequate, non-federal state ground,[17] at least where that state ground does not

---

**17.** In *Henry v. Mississippi, supra,* the Court stated that

It is, of course, a familiar principle that this Court will decline to review state court judgments which rest on independent and adequate state grounds, even where these judgments also decide federal questions. The principle applies not only in cases involving state substantive grounds, *Murdock v. City of Memphis,* 20 Wall. 590 [22 L.Ed. 429], but also in cases involving state procedural grounds. Compare *Herb v. Pitcairn,* 324 U.S. 117, 125–126 [65 S.Ct. 459, 462–463, 89 L.Ed. 789], with *Davis v. Wechsler,* 263 U.S. 22 [44 S.Ct. 13, 68 L.Ed. 143]. But it is important to distinguish between state substantive grounds and state procedural grounds. Where the ground involved is substantive, the determination of the federal question cannot affect the disposition if the state court decision on the state law question is allowed to stand. Under the view taken in *Murdock* of the statutes conferring appellate jurisdiction on this Court, we have no power to revise judgments on questions of state law. Thus, the adequate nonfederal ground doctrine is necessary to avoid advisory opinions.

These justifications have no application where the state ground is purely procedural. A procedural default which is held to bar challenge to a conviction in state courts, even on federal constitutional grounds, prevents implementation of the federal right. Accordingly, we have consistently held that the question of when and how defaults in compliance with state procedural rules can preclude our consideration of a federal question is itself a federal question. Cf. *Lovell v. City of Griffin,* 303 U.S. 444, 450 [58 S.Ct. 666, 668, 82 L.Ed. 949]. As Mr. Justice Holmes said:

"When as here there is a plain assertion of federal rights in the lower court, local rules as to how far it shall be reviewed on appeal do not necessarily prevail. . . . Whether the right was denied or not given due recognition by the [state court] . . . is a question as to which the plaintiffs are entitled to invoke our judgment. *Love v. Griffith,* 266 U.S. 32, 33–34 [45 S.Ct. 12, 12, 69 L.Ed. 157].

Only last Term, we reaffirmed this principle, holding that a state appellate court's refusal, on the ground of mootness, to consider a federal claim, did not preclude our independent determination of the question of mootness; that is itself a question of federal law which this Court must ultimately decide. *Liner v. Jafco, Inc.,* 375 U.S. 301 [84 S.Ct. 391, 11 L.Ed.2d 347]. These cases settle the proposition that a litigant's procedural defaults in state proceedings do not prevent vindication of his federal rights unless the State's insistence on compliance with its procedural rule serves a legitimate state interest. In every case we must inquire whether the enforcement of a procedural forfeiture serves such a state interest. If it does not, the state procedural rule ought not be permitted to bar vindication of important federal rights.[3]

[3] This will not lead inevitably to a plethora of attacks on the application of state procedural rules; where the state rule is a reasonable one and clearly announced to defendant and counsel, application of the waiver doctrine will yield the same result as that of the adequate nonfederal ground doctrine in the vast majority of cases.

379 U.S. at 446–48, 85 S.Ct. at 567.

unduly burden federal rights.[18] First, we will not assume that the Supreme Court in *Stone* overruled *Henry v. Mississippi*, 1965, 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408, *reh. denied*, 380 U.S. 926, 85 S.Ct. 878, 13 L.Ed.2d 813, and other cases applying the adequate state ground theory without an express statement from the Court that it was doing so. Second, a state court resolution of a Fourth Amendment claim on an adequate, independent, non-federal state ground is perfectly consistent with *Stone's* requirement that an *opportunity* be given for full and fair consideration by the state court. Third, a state court resolution of a Fourth Amendment claim on the basis of an adequate state ground is not inconsistent, and may indeed further, the general conclusion reached by *Stone* that the costs of the exclusionary rule generally outweigh its benefits. Finally, permitting a state court to resolve a Petitioner's Fourth Amendment claim on the basis of an adequate state ground furthers the conviction in *Stone* that state courts are as competent as federal courts to ensure that those rights are protected. Thus, if we find that the state appellate court was squarely faced with Petitioner's Fourth Amendment claim and decided it on an adequate, independent, non-federal state ground which did not unduly infringe upon his federal rights, we must necessarily find that Petitioner received full and fair consideration of his Fourth Amendment claims by the state court.

In this case, the state appellate court was squarely faced with Petitioner's Fourth Amendment claim. The Court had granted the Petitioner the opportunity to use this habeas corpus proceeding "for full appellate review by this Court of the judgment and sentence of the [Trial Court], on authority of *Hollingshead v. Wainwright*, Fla., 1967, 194 So.2d 577  .  .  .  ." Furthermore, the Petitioner took full advantage of this opportunity, by setting forth the facts and law respecting his Fourth Amendment claim exhaustively and persuasively before the state appellate court.

Our independent federal review of the state procedural ground asserted here assures us that the State's procedural rule requiring contemporaneous objections to evidentiary ruling to all but "fundamental error"[19] serves a legitimate state interest, and thus fulfills the *Henry* test for an adequate, independent, non-federal state ground of decision. In fact, *Henry* performs double duty for us today, for the Supreme Court in that case also discussed the issue of whether a state procedural rule requiring contemporaneous objection to the introduction of illegally seized evidence or testimony concerning the findings of an illegal search serves a legitimate state in-

**18.** *Cf. NAACP v. Alabama*, 1958, 357 U.S. 449, 457–58, 78 S.Ct. 1163, 1169, 2 L.Ed.2d 1488, 1497: "Novelty in procedural requirements cannot be permitted to thwart review in this Court applied for by those who, in justified reliance upon prior decisions, seek vindication in state courts of their federal constitutional rights." *See also* Sandalow, *Henry v. Mississippi and the Adequate State Ground: Proposals for a Revised Doctrine*, 1965 Sup.Ct.Rev. 187, 228 n.3: The Court "must assure also that state law, though evenly applied, does not unduly burden federal rights."

**19.** In *State v. Smith*, Fla., 1970, 240 So.2d 807, the Supreme Court of Florida discussed the fundamental error rule of the Florida courts:

In discussing fundamental error the Court in *Gibson v. State*, 194 So.2d 19 (Fla.App.2d, 1967) said:

"The Florida cases are extremely wary in permitting the fundamental error rule to be the 'open sesame' for consideration of alleged trial errors not properly preserved. Instances where the rule has been permitted by the

appellate Courts to apply seem to be categorized into three classes of cases: (1) where an involved statute is alleged to be unconstitutional, (2) where the issue reaches down into the very legality of the trial itself to the extent that a verdict could not have been obtained without the assistance of the error alleged, and (3) where a serious question exists as to jurisdiction of the trial Court." (p. 20)

This Court has recognized that every constitutional issue does not amount to fundamental error cognizable initially upon appeal, saying:

"Constitutional issues, other than those constituting fundamental error, are waived unless they are timely raised.

" 'Fundamental error,' which can be considered on appeal without objection in the lower court, is error which goes to the foundation of the case or goes to the merits of the cause of action. The Appellate Court should exercise its discretion under the doctrine of fundamental error very guardedly." *Sanford v. Rubin*, 237 So.2d 134, 137 (Fla.1970).

terest. The Supreme Court's discussion is therefore entirely in point here:

> The Mississippi rule requiring contemporaneous objection to the introduction of illegal evidence clearly does serve a legitimate state interest. By immediately apprising the trial judge of the objection, counsel gives the court the opportunity to conduct the trial without using the tainted evidence. If the objection is well taken the fruits of the illegal search may be excluded from jury consideration, and a reversal and new trial avoided.

379 U.S. at 448, 85 S.Ct. at 567.

We also conclude that this state procedural rule does not fall within the exception to the adequate state ground theory raised by the Supreme Court in *Williams v. Georgia*, 1955, 349 U.S. 375, 75 S.Ct. 814, 99 L.Ed. 1161:

> "A state procedural rule which forbids the raising of federal questions at late stages in the case, or by any other than a prescribed method, has been recognized as a valid exercise of state power. . . . But, where a State allows questions of this sort to be raised at a late stage and be determined by its courts as a matter of discretion, we are not concluded from assuming jurisdiction and deciding whether the state court action in the particular circumstances is, in effect, an avoidance of the federal right. A state court may not, in the exercise of its discretion, decline to entertain a constitutional claim while passing upon kindred issues raised in the same manner."

*Id.*, 349 U.S. at 382–83, 75 S.Ct. at 819.[20] Florida's contemporaneous objection rule and fundamental error rule do not fall within this exception since they do not allow questions of this sort to be raised at a late stage and be determined by its courts as a matter of discretion.[21]

■ Finally, we conclude that Florida's rule requiring contemporaneous objection does not unduly burden or interfere with federal rights. Petitioner was represented throughout his state trial by counsel and in no phase of this case's tortuous history has any court found that Petitioner failed to receive effective assistance of counsel during his trial. Furthermore, after raising it in the District Court, Petitioner has not even urged the effectiveness of counsel in his brief or oral argument before us so the issue is no longer open for our review. Under these circumstances, we cannot conclude that this state procedural rule unduly interferes with federal rights, since Petitioner had ample opportunity to raise his objections at the time the evidence was introduced, or at the close of all the evidence.[22]

### The End Is Near

■ Under the circumstances of this case, therefore, we conclude that the state appellate court's disposition of Petitioner's Fourth Amendment claims on an adequate, independent, non-federal state ground satisfied the requirement in *Stone* that the State provide an "opportunity for full and fair litigation" of Fourth Amendment claims. Since there are no facts in dispute concerning this search, we also conclude that consideration of these Fourth Amendment claims by the District Court of Appeals was sufficient. Accordingly, we are precluded by the Supreme Court's decision in *Stone* from considering Petitioner's Fourth Amendment claims in his federal habeas corpus petition.[23]

---

**20.** *See Sandalow, Henry v. Mississippi and the Adequate State Ground, supra*, at 225 n. 3: "The existence of the [discretionary] power suggests that no vital state interest is at stake. If some deviations from regular procedure can be tolerated, a few more can hardly be seriously disruptive."

**21.** *See* note 19, *supra*.

**22.** See *Henry v. Mississippi, supra*, 379 U.S. at 448–49, 85 S.Ct. 564.

**23.** We reject out of hand Petitioner's contention that *Stone* should only be given prospective effect. The Court in *Stone* refused to give its opinion that effect (*see Stone, supra*, 495 U.S. at 428, n.38, 96 S.Ct. at 3052, n.38, 49 L.Ed.2d at 1088, n.38), as have the Courts in this Circuit which have applied *Stone*. *See, e. g., Caver v. Alabama*, 5 Cir., 1976, 537 F.2d 1333; *George v. Blackwell*, 5 Cir., 1976, 537 F.2d 833; *Wright v. Wainwright*, 5 Cir., 1976, 537 F.2d 224.

REVERSED.

GOLDBERG, Circuit Judge, dissenting:

I respectfully dissent.

In *Stone v. Powell,* 428 U.S. 465, 496, 96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067 (1976), the Supreme Court held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." In *Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), the Supreme Court held inapplicable to federal habeas proceedings the doctrine under which state judgments resting on an independent state procedural ground were not directly reviewable in that Court. Under *Fay* the district court might deny relief only where a petitioner had deliberately bypassed or knowingly waived his right to raise a federal constitutional claim in the state courts. This appeal raises the question whether a state that refuses to adjudicate a fourth amendment claim because of a defendant's noncompliance with a state procedural rule when that noncompliance cannot be equated with a deliberate bypass nonetheless may be said to have afforded the "opportunity" to litigate a fourth amendment claim in the state courts, triggering *Stone's* preclusion of federal habeas relief.

I read the majority opinion as equating O'Berry's failure to make timely objection with the opportunity for full and fair consideration of his fourth amendment claim. The majority arrives at this equation without discussing, almost without noting, the very case in which the Supreme Court directly held that the independent state procedural ground doctrine, on which the majority here relies, does not apply to federal habeas corpus.

If this case stands, *Fay* has been effectively overruled as far as fourth amendment rights are concerned. The *Stone* Court did not clearly indicate such an inten-tion. With all respect, I do not think that the majority opinion, thoughtful and sensitive in so many particulars, has offered sufficient justification for carrying *Stone* to this extent. Nor do I find that other developments in the Supreme Court have sapped *Fay* of vitality.

Perhaps one should reconcile oneself to the New Stone Age of jurisprudence. The imperative of judicial somnolence, however, is not yet unequivocal. I will not indulge the presumption that the Great Writ is to be further eroded, in this or any other context. The district court specifically found no indication of a *Fay* deliberate bypass. No substantial suggestion to the contrary is advanced here. I would conclude therefore that this petitioner did not have a full and fair opportunity to litigate his fourth amendment claim in the state courts. Accordingly, I would reach the merits of that claim and affirm the judgment of the district court.

I. Stone *Versus* Fay

As the majority correctly recognizes, *Stone* itself did not explain the contours of its mandated "opportunity" to litigate fourth amendment claims. *See also Pulver v. Cunningham,* 419 F.Supp. 1221 (S.D.N.Y. 1976). *Stone* was fundamentally concerned with the costs of permitting federal *relitigation* of state court rulings on fourth amendment objections. *See, e. g., Stone, supra,* 428 U.S. at 491, 96 S.Ct. at 3050. At least one state tribunal had reached a determination on the merits of the fourth amendment claims raised by the applicants who were before the Court. As a result, the Court's decision operated only to close a federal forum to individuals who had exercised their opportunity to litigate fourth amendment claims in a state forum. The Court was not faced with, and did not allude to, the problem of determining whether or when a state's withdrawal of that opportunity because of a procedural error would forfeit the right to federal collateral relief.[1] The degree to which a state statu-

1. *Stone* offered no explanation of the significance of the term "opportunity for a full and fair litigation" beyond a citation to *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d

tory roadblock can halt a fourth amendment claimant en route to the federal habeas forum is rather the problem faced by this court today.

More specifically, we must determine when failure to comply with a state procedural rule will act as a binding forfeiture, rather than a remediable denial, of a prisoner's "opportunity for full and fair litigation" of his fourth amendment claim in the state courts. The majority implies that a defendant who fails to comply for whatever reasons, benevolent or nefarious, knowing or ignorant, tactical or inadvertent, has not been denied the requisite opportunity. That is, assuming no deliberate bypass, assuming no knowing waiver, a statute that requires a contemporaneity in objecting to the introduction of evidence is sufficient under the majority's reading conclusively to satisfy the state's obligation to provide that opportunity.

The difference in the fate of the habeas applicants rebuffed in *Stone* and that of O'Berry must be emphasized. The prisoners in *Stone* did receive state court attention to the merits of their federal claim. Because of O'Berry's procedural error, the majority's decision means that he will never be permitted to place the merits of his federal claim before *any* forum. *Fay v. Noia* provides the traditional standard for application of the radical sanction imposed by the majority today. The majority alludes to *Fay* only in passing. I would begin and end there.

In *Fay,* the prisoner had failed to take a timely direct appeal in state court. The state asserted that this default in the face of a legitimate procedural rule precluded the habeas court from inquiry into the prisoner's coerced confession claim. The court's rejection of this position was unequivocal:

> the doctrine under which state procedural defaults are held to constitute an adequate and independent state law ground barring direct Supreme Court review is not to be extended to limit the power granted the federal courts under the federal habeas statute.

372 U.S. at 399, 83 S.Ct. at 827. The Court then defined very narrowly the circumstances in which the failure to raise a federal claim in state court would cut off consideration of that claim in federal habeas proceedings:

> If a habeas applicant, after consultation with competent counsel or otherwise, understandingly and knowingly forewent the privilege of seeking to vindicate his federal claims in the state courts, whether for strategic, tactical, or any other reasons that can fairly be described as the deliberate by-passing of state procedures, then it is open to the federal court on habeas to deny him all relief if the state courts refused to entertain his federal claims on the merits—though of course only after the federal court has satisfied itself, by holding a hearing or by some other means, of the facts bearing upon the applicant's default.

372 U.S. at 439, 83 S.Ct. at 849. According to the Supreme Court, the exigencies of federalism surely required no more. *Id.* at 433, 83 S.Ct. 822.

## II. *Deciphering* Stone

Nothing in *Stone* or the majority opinion persuades me that the Court's choice of the term "opportunity for full and fair litigation" effected a pro tanto overruling of

---

770 (1963). *See Stone, supra,* 428 U.S. at 494, n.36, 96 S.Ct. at 3052, n.36. I agree with the majority that the citation does not mean federal habeas will always be available when the state courts fail to make a determination on the merits in accordance with *Townsend* criteria. The citation suggests rather that when a determination on the merits is made, it must meet *Townsend* criteria. The use of the term "op-

portunity", however, suggests that a determination on the merits will not always be a prerequisite to application of *Stone.* The question before us is when a litigant will be deemed to have had the opportunity to make his claim and forfeited it. *Townsend* does not directly relate to this question; citation of that case, however, suggests if anything a presumption against forfeiture.

*Fay's* deliberate by-pass standard.[2] The majority goes further, without sufficient justification in my opinion, than *Stone* compels it to do. After *Stone,* criminal defendants remain entitled to have state courts exclude from their trials evidence seized in violation of the fourth amendment. The states remain bound to provide defendants an opportunity to have such claims determined on the merits. I would read *Stone's* unelaborated choice of the term "opportunity", consistently with *Fay,* to imply that noncompliance with state procedural rules will preclude consideration of a fourth amendment claim on the merits in federal habeas proceedings only if that noncompliance was the product of a deliberate, knowing decision of defendant and his counsel.

First, the Court in *Stone* admittedly re-emphasized its position that the exclusionary rule "is not a personal constitutional right . . . Instead, 'the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect.'" *Stone, supra,* 428 U.S. at 486, 96 S.Ct. at 3048. *See also United States v. Peltier,* 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975); *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). Whatever the precise significance of this unexplained limbo between remedies that are a "necessary incident" of a constitutional guarantee of individual liberty and those imposed under the Court's supervisory powers, *see* Monaghan, *The Supreme Court 1974 Term, Foreward: Constitutional Common Law,* 89 Harv.L.Rev. 1 (1975), *Stone* nevertheless made quite plain that defendants are still entitled to have state courts exclude evidence seized in violation of the fourth amendment, a requirement that must ultimately be derived from the Constitution. The fact that in some sense the exclusionary rule is not a "personal constitutional right" simply does not begin to explain in what circumstances federal habeas proceedings will remain unavailable when the state

courts, in enforcing a procedural rule, refuse to consider the "remedy" *Stone* leaves intact. The fourth amendment's clothing may be ragged, its raiment thin, but that in itself does not determine that the protection of this tatterdemalian is to be forever denied a defendant who, without any knowing waiver or tactical decision not to object, is convicted through the use of unconstitutionally seized evidence.

Moreover, the *Stone* discussion of the high costs of the limited deterrence provided by enforcement of fourth amendment claims on collateral attack does not readily apply to the situation in which the state courts have made no determination on the merits. *Stone* concluded that, costs notwithstanding, the deterrence rationale supported continued enforcement of the exclusionary rule at trial and on direct appeal. One is entitled to assume the sincerity of that conclusion. The exclusionary rule has been stoned, but it is not dead. The authoritative view remains that it is worth the social costs for law enforcement officers to know that *someone* will measure their behavior against the fourth amendment. *Stone* clearly determined that where the state has passed on a fourth amendment claim, the additional deterrent effect of collateral review is not worth the price. It remains consistent with the Court's deterrence analysis, however, for the federal courts to consider claims where the states have not.

In the first place, the majority's approach might result in a dilution of deterrent effect beyond the level left intact in *Stone.* Given the oppressive case loads on public defender offices and the frequently lax standard of representation enforced by federal courts in the name of the sixth amendment, a rule precluding habeas review whenever a state defendant had not raised a fourth amendment objection in the state courts could operate as a significant inducement to officers to leave the fourth amendment behind.

**2.** One commentator has already recognized that application of *Stone* to state prisoners like O'Berry, who failed to raise a fourth amendment claim in state court but cannot be said to have deliberately bypassed state procedures, would be inconsistent with *Fay. See* The Supreme Court, 1975 Term, 90 Harv.L.Rev. 56, 218, n.45.

Second, an officer admittedly may not be significantly moved by a grant of the writ based on his behavior several years earlier. Such a simplistic view overlooks another aspect of the exclusionary rule's deterrent effect:

> [t]he exclusionary rule is not aimed at special deterrence since it does not impose any direct punishment on a law enforcement official who has broken the rule . . . . . The exclusionary rule is aimed at affecting the wider audience of law enforcement officials and society at large. It is meant to discourage violations by individuals who have never experienced any sanction for them.

> . . . . .

> As a visible expression of social disapproval for the violation of these guarantees, the exclusionary rule makes the guarantees of the fourth amendment credible. Its example teaches the importance attached to observing them.

Oaks, *Studying the Exclusionary Rule in Search and Seizure*, 37 U.Chi.L.Rev. 665, 709–11 (1974). Determination of fourth amendment claims in federal habeas proceedings on occasions when state courts have made no determination effectuates the *Stone* conclusion that this society shall maintain that "visible expression" and provide at least one level of enforcement of the exclusionary rule. More simply, the fourth amendment stone is still to be turned once; it makes little difference in terms of the costs and benefits that may be tied to the exclusionary rule itself whether the federal or state courts do the turning.

The majority today has added no stronger reasons for applying *Stone* to those who have not knowingly waived their rights to assert fourth amendment claims in state court. The majority's discussion of *Henry v. Mississippi,* 379 U.S. 443, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965), unfortunately serves only to signify the degree to which it has missed the importance of *Fay. Henry* was a direct appeal in which the Court applied the independent state procedural ground doctrine. The Court specifically noted that a dismissal on that ground would not pre-

clude habeas relief unless the petitioner had deliberately bypassed the state courts. The majority today determines that *Stone* has diluted *Fay's* deliberate bypass standard in the fourth amendment context. An unhappy irony is that it does so in part on the basis of the direct appeal taken by Mr. Henry, who, despite his failure to tender a fourth amendment claim in compliance with a state contemporaneous objection rule, ultimately was released pursuant to a grant of the Great Writ when a federal district court in this circuit determined that his procedural default had not constituted a knowing waiver. *See Henry v. Williams,* 299 F.Supp. 36 (N.D.Miss.1969).

The majority points out that its rule is consistent with the fact that *Stone* requires only an *opportunity* for litigation, rather than litigation itself. Application of the *Fay* test is equally consistent with *Stone.* Neither standard suggests that *Stone* applies only when a state court actually reached the merits of the fourth amendment claim.

Finally, *Stone's* unexceptionable vote of confidence in state court enforcement of fourth amendment rights does diminish any concern that those tribunals will employ procedural rules to avoid disfavored constitutional claims. Nonetheless that observation may apply equally to the universe of constitutional claims outside the fourth amendment. *Stone* explicitly purports to limit itself to the latter and can provide no authority for diluting the *Fay* waiver standard outside the fourth amendment context. As long as *Fay* itself validly applies to those remaining claims, regardless of shifting perceptions of the quality of state courts, those perceptions provide no authority for diluting *Fay* in the fourth amendment context alone.

### III. Fay *Today*

Placing such reliance on *Fay,* I am obligated to consider another stone recently thrown in its path. In *Francis v. Henderson,* 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976), the court held that a state defendant who failed to make a timely pre-

trial objection to the composition of the grand jury could not raise that objection in federal habeas proceedings absent a showing of cause for the failure and actual prejudice. Dissenting, Justice Brennan candidly commented that the decision could be read to stop short of overruling *Fay* across the board only if the decision meant that the consequences of the failure timely to object in accordance with state law varied with the constitutional right implicated in the objection. I join Justice Brennan in assuming that the Supreme Court will squarely come to grips with *Fay* if it feels the decision has proved unsound. *But see* Shapiro, *Justice Rehnquist, A Preliminary View,* 90 Harv.L.Rev. 293, 352–54 & nn. 310, 312 (1976). Accordingly, I view *Francis* as *sui generis,* resting on particular problems raised by objections to the process of initiating prosecutions. As the Court in *Francis* emphasized, the state has a very strong interest in enforcing a requirement that objections to grand jury composition be made prior to trial. If it fails to enforce such a requirement, a defendant likely has only an indictment from a new grand jury to gain by pretrial objection. The strong temptation would be to save the objection to obtain a reversal in the event acquittal was not forthcoming. Such an incentive structure generally does not exist with regard to fourth amendment suppression motions. A successful motion will frequently impair, if not destroy, the prosecution's ability to proceed. Absent the strong state interest in a procedural rule as evidenced in *Francis,* I see no reason to depart from *Fay's* determination that the "exigencies of federalism" do not realistically require a narrower opening to the writ's relief than that comprehended in the "knowing waiver" or "deliberate bypass" standard.[3]

### CONCLUSION

Under *Stone* criminal defendants are entitled to have state courts deny admission to unconstitutionally seized evidence. Federal habeas proceedings stand open to assure defendants an opportunity to exercise that entitlement. As long as both of these premises remain valid, I would measure the forfeiture of that assurance by the standard employed generally to measure the forfeiture of federal collateral attack on the basis of past noncompliance with state procedural rules—the "deliberate bypass" or "knowing waiver" of *Fay v. Noia.* The majority erects from the Supreme Court stepping stone a fourth amendment overpass bypassing *Fay* itself almost without mention of that opinion. Perhaps it too closely followed the example of that Court. If I may respectfully suggest as much, I would join Justice Brennan in distress at decisions

> where the Court also exposes its hostility towards and makes substantial inroads into the precedential force of *Fay* without directly confronting its underlying premises, its continuing validity, or the possibility of distinguishing the failure to raise different constitutional rights in a timely manner in the state courts.

.  .  .  .  .

If the Court believes that *Fay* is no longer good law, and if the Court has the "institutional duty" to develop and expli-

**3.** Justice Powell's concurring opinion in *Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 1697, 48 L.Ed.2d 126 (1976), joined by Justice Stewart, does suggest that a procedural default that cannot be labeled a knowing waiver can foreclose collateral review of a federal constitutional claim. Nevertheless Chief Justice Burger's opinion for the Court does not adopt such an analysis, and *Estelle* cannot be said to have overruled *Fay.* Moreover, O'Berry's failure is not clearly within even Justice Powell's broadened definition of "inexcusable procedural default":

> [The policy against inferring waivers of constitutional rights] need not be carried to the length of allowing counsel for a defendant deliberately to forego objection to a curable trial defect, even though he is aware of the factual and legal basis for an objection simply because he thought objection would be futile.

*Id.* at 515, 96 S.Ct. at 1698. It is unclear whether O'Berry or his counsel ever attended to his fourth amendment claim during the trial. Consequently if the concurring opinion in *Estelle* controlled this case, the remedy would be at least a remand to the district court to allow O'Berry an opportunity to prove his default excusable under the new standard.

**1224**

cate the law in a reasoned and consistent manner, then it has the duty to face squarely our prior cases interpreting the federal habeas statutes and honestly state the reasons, if any, for its altered perceptions of federal habeas jurisdiction. *Francis v. Henderson, supra,* 425 U.S. at 546–547, 96 S.Ct. at 1714 (Brennan, J., dissenting). Until the Supreme Court does so in large letters, I shall continue to pay homage at the shrine of *Fay.*

This petitioner's failure to object did not transgress the standard set in that landmark case. Thus I would conclude that the merits of his fourth amendment claim were properly before the district court under *Stone.* Because I would affirm that court's judgment on the merits, I respectfully dissent.