**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Cudell WATKINS, Defendant-Appellant.**

No. 83–2583.

United States Court of Appeals,
Fifth Circuit.

Aug. 29, 1984.

Carolyn Garcia, Houston, Tex., for defendant-appellant.

Daniel K. Hedges, U.S. Atty., James R. Gough, Asst. U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before GEE, POLITZ and RANDALL, Circuit Judges.

POLITZ, Circuit Judge:

Convicted of robbery of postal clerks and postal customers, 18 U.S.C. §§ 2114, 2111 and 7, Cudell Watkins appeals, arguing that he was deprived of a fair trial because an in-court identification was tainted by an impermissibly suggestive showup at the crime scene. Finding the assigned error harmless, we affirm.

### Facts

In the early afternoon on March 18, 1983, two postal clerks and two customers in the Weslayan Post Office, Houston, Texas, were robbed by a slender black man wearing dark pants, a maroon jacket, a stocking mask and tan headgear. The robber entered the post office with a drawn gun, vaulted over the counter, ordered the customers to lie face down on the floor with their money placed on the floor beside them, and commanded the postal clerks to deliver over cash and money orders and then join the customers on the floor. The two customers, Barbara Pollett and Lois Wallace, complied with the shouted orders and did not look up until after the robber left. The two clerks handed over approximately $1,700 in cash and six marked "bait" money orders which the robber put in a paper sack.

Immediately after the robber exited the building the clerks notified their supervisor who was in the rear of the post office. The supervisor ran to the front of the building and saw a black man on the parking lot dressed in a maroon jacket and carrying a paper bag. The customers testified that they pointed to this man as the robber. One of the postal clerks did likewise. The supervisor gave chase and the man fled. Police officers joined the chase through a

residential area and a few minutes later an exhausted and winded Watkins was found hiding in a shed at the rear of a house and arrested. Watkins was not wearing a jacket or headgear when arrested; he had no gun and carried no paper bag. An officer backtracked the chase route and in a nearby yard found a paper bag containing money and postal money orders.

While the chase was in progress the customers and postal clerks were interviewed by an investigator. All agreed that the robber was a tall slender black male wearing dark pants. All recalled a stocking mask. There was no unanimity, however, as to the type of headgear, cap or hat, or the exact color of the jacket. Barbara Pollett gave only a general description and did not indicate that she could identify the culprit.

Immediately after Watkins was arrested he was handcuffed and returned in a patrol car to the post office. Each of the victims was brought to the car to see if they recognized the occupant. No one identified Watkins but all said that the person in the patrol car was built similar to the robber but wore different clothing.

During the course of the investigation, the officers collected a change of address card from the counter where the robber had placed his hand for balance when he jumped over it. This card, together with the paper bag and its contents, were sent to a crime lab for fingerprint and palmprint testing. Watkins' left index fingerprint was found on the paper bag and a partial left palm print matching Watkins' was found on the change of address card.

Several hours after the robbery three bloodhounds were brought to the post office. They were "scented" by being allowed to smell the clothing Watkins was wearing when arrested. One dog, nicknamed "Tracker," followed the chase path to the shed where Watkins was found and arrested. The other dogs took a somewhat different path but ended at the same shed. Tracker was then taken inside the front of the post office and was again scented. The bloodhound went directly to the place where the robber had vaulted over the counter. Taken behind the counter, Tracker went directly to the point where the robber stood after jumping over the counter.

Two weeks or so after the incident, a lady who lived near the arrest site found a maroon jacket in her barbeque pit. A gun identified by a pawnshop operator as having been sold to Watkins shortly before the robbery was found in a pocket of that jacket. The victims testified that that jacket was similar to the one worn by the robber.

Prior to trial the defense moved for suppression of identification evidence. The prosecutor informed the court that such was not necessary because the government had no witness who would identify Watkins as the robber. The prosecutor so advised the jury during his opening statement. However, on direct examination Pollett identified the man on the back seat of the patrol car as the robber. When pressed on cross-examination whether she could testify that Watkins was the robber, she replied: "Insofar as I remember, I would say yes." The defense objected and now urges that Pollett's testimony was tainted by a suggestive showup which violated the due process clause.

### The Identification Testimony

■ An identification procedure violates due process when it is "unnecessarily suggestive and conducive to irreparable mistaken identification." *United States v. Atkins*, 698 F.2d 711, 713 (5th Cir.1983) (*quoting Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967)). One-on-one showups are inherently more suggestive than lineups and we have purposely not encouraged their use. *Allen v. Estelle*, 568 F.2d 1108 (5th Cir.1978). Showups are particularly suspect when the circumstances increase the likelihood of misidentification. Id. We have enumerated six factors to be weighed in evaluating the risk of misidentification:

(1) the opportunity of the witness to view the criminal, (2) the witness' degree

of attention, (3) the accuracy of the description, (4) the witness' level of certainty, (5) the elapsed time between the crime and the identification, and (6) the corrupting influence of the suggestive identification itself.

*United States v. Atkins,* 698 F.2d at 713.

▮ Barbara Pollett had very little opportunity to view the robber; she was lying face down on the floor for all but a few seconds of the robbery and the assailant wore a stocking mask. There is no evidence that she was particularly attentive during those few seconds or that she was specially trained to observe people for later identification. Her description of the assailant immediately after the robbery related only to general size, body build, race, and clothing. According to other witnesses and the prosecutor Pollett could not identify Watkins at the patrol unit. However, she did make at least an equivocal identification at trial. The only factor supporting reliability is the short span of time between the robbery and the showup. But taken as a whole, the overall factors suggest a substantial likelihood of misidentification. When the circumstances surrounding the showup create a substantial likelihood of misidentification and there is no evidence of factors indicating that the in-court identification was based upon reliable factors other than the suggestive showup, the in-court identification testimony should not be permitted. *Swicegood v. State of Alabama,* 577 F.2d 1322 (5th Cir.1978).

### Harmless Error

▮ Since we conclude that the showup was unduly suggestive and that it probably impacted on Pollett's in-court identification, we must determine whether the admission of that testimony constitutes reversible or harmless error. In determining whether an error is harmless we look to the totality of circumstances including all of the evidence adduced. We spoke to the applicable standard in *Harryman v. Estelle,* 616 F.2d 870, 876 (5th Cir.1980) (en banc):

As the Supreme Court made clear in *Fahy* [*v. Connecticut,* 375 U.S. 85 [84 S.Ct. 229, 11 L.Ed.2d 171] (1963) ] and in every constitutional harmless error case that it has decided since, the question of whether or not a constitutional error was harmless cannot be answered by considering the error in isolation. As the Court stated in *Fahy,* "it is necessary to review the facts of the case and the evidence adduced at trial" to determine the effect of the unlawfully admitted evidence "upon the other evidence adduced at trial and upon the conduct of the defense." 375 U.S. at 87, 84 S.Ct. at 230, 231. A court must then decide whether, absent the so-determined unconstitutional effect, the evidence remains not only sufficient to support the verdict but so overwhelming as to establish the guilt of the accused beyond a reasonable doubt." (Citations and footnote omitted.)

▮ The evidence the government marshalled, totally disregarding Pollett's unexpected courtroom identification, overwhelmingly established Watkins' guilt. Both customers and one of the postal clerks, the latter having an abundance of opportunity to observe the robber, identified the man wearing a maroon jacket, carrying a paper bag and running across the shopping center parking lot as the robber. The postal supervisor who chased that man across the mall and through an adjacent residential area, identified Watkins as the man wearing the maroon jacket, carrying the bag, fleeing the scene, who was later cornered and arrested. A bag containing the cash and the marked money orders was found in a yard which the chase traversed. Watkins' fingerprint was lifted from the bag. In a nearby yard a maroon jacket was found in a barbeque pit. A gun recently sold to Watkins was in a pocket of that jacket. Watkins' general description and build matched the unanimous description of the assailant given immediately after the incident by the two customers and the two postal clerks. Watkins' palmprint was found on a change of address card located on the top of the counter where Watkins placed his left hand as he hurdled the counter. The bloodhound Tracker,

scented with Watkins' clothing, traced the escape route from the front of the post office to the arrest site and then signaled both sides of the counter precisely at the cubicle where the robber stood. In light of this evidence, together with the other evidence about the chase itself, we are persuaded that the allowance of the introduction of the identification testimony of Pollett was harmless error.

AFFIRMED.