**Joe Freddie FLEMING,
Petitioner–Appellant,**

v.

**James A. COLLINS, Director, Texas Department of Criminal Justice, Institutional Division, Respondent–Appellee.**

No. 88–1334.

United States Court of Appeals,
Fifth Circuit.

Nov. 5, 1990.

---

Joe Freddie Fleming, Rosharon, Tex., pro se.

S. Michael Bozarth, Asst. Atty. Gen., Jim Mattox, Atty. Gen., Austin, Tex., for respondent-appellee.

Before BROWN, WILLIAMS and JONES, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

As a result of a 1979 bungled bank robbery, Joe Freddie Fleming was convicted in Texas state court of aggravated robbery and sentenced to forty years imprisonment. He petitions for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, attacking his conviction. After examining Fleming's claims, the district court denied relief. We find that the trial court erred by permitting the introduction of evidence obtained in violation of Fleming's privilege against self-incrimination. Because we cannot conclude that the error was harmless beyond a reasonable doubt, we reverse.

I.

The following facts were alleged at Fleming's trial. On February 20, 1979, three men, one of whom was Fleming, entered Buckner State Bank in Dallas, Texas. One of the men other than Fleming approached a bank security guard and began to give him orders at gunpoint. When the bank guard refused the orders and eventually foiled the robbery, all three of the men fled the bank. Before Fleming made it out the door, he was shot twice by the security guard..

Fleming continued from the bank on foot. The security guard followed him outside and fired two more shots, neither of which hit Fleming. About that time, Don Adams, a used car salesman, heard a gunshot and saw Fleming run in front of the car lot where he worked. He pursued Fleming. With the aid of a truck and a pistol, Adams eventually overtook Fleming in a vacant field. Adams held Fleming at gunpoint.

Two Dallas police officers, responding to the bank robbery alarm, saw the two men, one on his knees and the other with a gun in his hand. They stopped the police vehicle, exited with guns drawn, and approached Fleming and Adams. When Officer Jan Montgomery told Fleming to put his hands up, he responded: "I can't. I'm shot. I'm shot." Montgomery then asked who shot him. He responded that it was the man at the bank. She asked where Fleming's gun was. He said he had

thrown it down. When she asked his name, he answered "Johnny Ray Powers." Montgomery then asked Fleming if he had been involved in the robbery at the Buckner State Bank. He answered affirmatively. She placed him under arrest for the robbery.

Less than one month after his arrest, Fleming was indicted for aggravated robbery. He pleaded not guilty. In May 1979, Fleming was tried, along with a co-defendant, and convicted. In 1983, the Texas Court of Criminal Appeals affirmed the conviction.

Soon thereafter, Fleming filed, *pro se*, a habeas petition in state court. The Court of Criminal Appeals granted relief in part and denied relief in part.[1] Fleming then filed a habeas petition in federal district court on the claims on which the Texas court had denied relief.[2] A United States magistrate considered Fleming's claims and recommended that relief be denied. After reviewing the magistrate's report and Fleming's objections to it, the district court adopted the magistrate's findings and conclusions and denied relief. Fleming appeals.

Fleming attacks his conviction on three grounds. He argues that: (1) the trial court erred by allowing into evidence the statements he made to Officer Montgomery prior to his arrest since she had not given him *Miranda* warnings; (2) the trial court erred by refusing to hear argument on the issue of whether the jury was improperly exposed, during a recess, to a conversation between a bailiff and district attorney; and (3) the jury charge was defective. Because we grant habeas corpus on Fleming's conviction on the first ground, we need not reach the other claims he raises.

## II.

Fleming asserts that the trial judge committed reversible error by allowing the prosecution to introduce in evidence the statements that he purportedly made to Officer Montgomery. He contends that the statements were inadmissible because Montgomery failed to precede her questioning with the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). As such, the introduction of the statements constituted a Fifth Amendment–Fourteenth Amendment violation of the privilege against self-incrimination.

In reviewing Fleming's claim, the magistrate determined that the questioning fell under the public safety exception, a limited exception to *Miranda* recognized by the Supreme Court in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). The magistrate went on to determine that any error at trial was harmless beyond a reasonable doubt, in light of the fact that the bank guard positively identified Fleming as the person he shot. We disagree because we find several of the questions outside the public safety exception. Moreover, we find that the introduction of Fleming's responses to those questions was not harmless beyond a reasonable doubt.

■ *Miranda* warnings are required to be given to individuals who are undergoing custodial interrogation. One not formally arrested is deemed to be in custody if a reasonable person in the suspect's position would understand the situation to constitute a restraint on freedom of movement of the degree that the law associates with formal arrest. *United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir.) (en banc), *cert. denied*, 488 U.S. 924, 109 S.Ct. 306, 102 L.Ed.2d 325 (1988). A "reasonable person" is one "neither guilty of criminal conduct and thus overly apprehensive nor insensitive to the seriousness of the circumstances." *Id.* "Interrogation is defined as words or actions that the police should know are reasonably likely to elicit an in-

---

1. The relief resulted in deletion from the judgment and sentence the trial court's affirmative finding that Fleming used or exhibited a deadly weapon. The pistol that Fleming purportedly *threw down was never found.*

2. He later filed an amended petition raising claims not raised in the state court petition. He eventually dismissed with prejudice those new claims.

criminating response from the suspect." *Gladden v. Roach*, 864 F.2d 1196, 1198 (5th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 3192, 105 L.Ed.2d 700 (1989) (citing *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980)).

■ We have no doubt that a "reasonable person" in Fleming's position—crouched on the ground and held at gunpoint by a citizen and then by a police officer—would have understood the situation to constitute the requisite restraint on freedom of movement. It is so clear that Fleming was in "custody" at the time of questioning that neither the district court nor the state suggested otherwise. Moreover, at least some of the questions asked by Montgomery, particularly those regarding Fleming's role in the robbery, are of the types reasonably likely to illicit incriminating responses.

■ Since we find that Fleming should have been administered *Miranda* warnings, we next determine whether the public safety exception outlined in *Quarles* applies to Fleming's situation. In *Quarles*, the Supreme Court concluded that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Quarles*, 467 U.S. at 657, 104 S.Ct. at 2632.

The facts in *Quarles* were in some ways similar to those of Fleming's case. In *Quarles*, a woman approached a police car and told police officers that she had just been raped. She described the assailant and told the officers that he had just entered a nearby supermarket. She informed them that he was carrying a gun. One of the officers entered the store and saw Quarles, who matched the description given by the woman. When Quarles ran toward the back of the store at the sight of the officer, the officer pursued him with a drawn gun. The officer ordered Quarles to stop and put his hands over his head, which Quarles did. The officer then frisked and handcuffed him and, finding an empty holster, asked where he had put the gun. Quarles nodded toward the place he had hidden a loaded gun and said, "the gun is over there." The trial court suppressed the statement,[3] the state court of appeals affirmed, and the Supreme Court reversed, creating the public safety exception to *Miranda*.

Fleming specifically objects, as did his attorney at trial, to the facts as established by the following line of questioning of Montgomery by the prosecutor:

Q.: When you first approached him, what was the first thing that you did?

A.: I told him to get his hands up and to put his hands up because I didn't know whether he had a gun in his hand. I didn't know what was going on. It was very confusing.

Q.: Did he say anything to you when you said, "Get your hands up"?

[Defense counsel objects; overruled]

A.: Yes, he did.

Q.: What did he say in response to you saying "Get your hands up"?

[Running objection by defense counsel; accepted]

A.: He said, "I can't. I'm shot. I'm shot."

Q.: Okay. Did you ask him who shot him?

A.: Yes, I did.

Q.: Did he answer that question?

A.: Yes, he did.

Q.: What did he say?

A.: He said the man at the bank.

Q.: Did you ask him, "Where is your gun?"

A.: Yes, I did.

Q.: Did he answer that question?

A.: Yes, he did.

Q.: What did he say?

A.: He said, "I threw it down."

Q.: Did you ask him what his name was?

---

**3.** The court suppressed Quarles' reference to the place the gun was hidden as well as other statements Quarles made about the gun after knowingly waiving his *Miranda* rights. The court determined that the evidence obtained from the later questioning was tainted by the *Miranda* violation.

A.: I did.

Q.: What did he say his name was?

A.: Johnny Ray Powers.

Q.: Did you ask him whether or not he had been involved in a robbery of the Buckner State Bank?

A.: Yes, I did.

Q.: Did he say—

[Defense objections to leading question; overruled]

Q.: Tell us whether or not the man who identified himself as Johnny Ray Powers told you he had been involved in the robbery at the Buckner State Bank?

[Objection by defense counsel; overruled]

A.: Yes, he did.

Q.: After your conversation with Fleming, did you place him under arrest?

A.: Yes, I did.

Q.: What did you place him under arrest for?

A.: For the robbery of the Buckner State Bank.

Although we find that the public safety exception applies to some of the questions Officer Montgomery posed to Fleming, it does not cover them all. Montgomery's question about who shot Fleming is consistent with the *Quarles* exception. As Montgomery testified at a pretrial hearing, "I asked him, 'Who shot you?' because I didn't know if it was the man holding the gun [Adams]. I didn't know who he was or anything...." The second question is not as clearly acceptable under *Quarles*. This case differs from *Quarles* because Montgomery did not have knowledge that Fleming had been carrying a gun. She did not have the victim's statement, as did the officer in *Quarles*, and she did not find an empty holster. The fact that Fleming had been shot did not lead to the conclusion

that he necessarily, or even likely, had possessed a gun.

We do not need to determine whether Fleming's response about the gun falls under the exception, however, because the remaining and most damaging question and answer came after he said he no longer had a gun.[4] It did not fall within the *Quarles* exception. Montgomery questioned Fleming about whether he had been involved in the bank robbery. Once Montgomery had apprehended Fleming and ascertained that he did not have a gun (both by frisking him and asking him what he did with it), she did not need to continue the line of questioning. Neither the state nor the district court explains why the remaining questions about his involvement in the bank were necessary to public safety.[5] *Quarles* holds that

> when the police arrest a suspect under circumstances presenting an imminent danger to the public safety, they may without informing him of his constitutional rights ask questions *essential* to elicit information necessary to neutralize the threat to the public. *Once such information has been obtained, the suspect must be given the standard warnings.*

*Berkemer v. McCarty*, 468 U.S. 420, 429 n. 10, 104 S.Ct. 3138, 3145 n. 10, 82 L.Ed.2d 317 (1984) (emphasis added). Montgomery should have given Fleming his *Miranda* warnings, at least before asking him whether he was involved in the robbery. Failure to do so meant that Fleming was not advised of his right to protect himself against self-incrimination. The statement was obtained in violation of the Fifth Amendment and Fourteenth Amendment. Its admission, therefore, constituted error of constitutional magnitude.

---

**4.** We do not need to decide any issue about a gun because the Texas Court of Criminal Appeals reformed the judgment to delete the trial court's finding that Fleming had exhibited or used a gun. To the extent that the statement that he threw down the gun might have contributed to his conviction, we need not consider it.

**5.** In its brief, the state merely asserts that Fleming has not shown why the questioning falls

outside of *Quarles*. It offers no basis to support the district court's conclusion that *Quarles* applied.

The *Quarles* exception is so limited an exception to *Miranda* that we find no cases since *Quarles* in which the Supreme Court or Fifth Circuit has invoked the exception. We may not apply it casually.

■ The magistrate and district court found and the state contends that even if Montgomery's testimony about Fleming's response to the question should not have been admitted in evidence, any error involved in its admission was harmless. The only analysis the magistrate offers for that conclusion, however, is that "since petitioner was positively identified by the bank guard as the man whom he had shot, any error attendant upon the admission of the statement was harmless beyond a reasonable doubt." In its brief, the state merely quotes from the magistrate's report. After a thorough review of the record, we are compelled to reach a different conclusion. We cannot find beyond a reasonable doubt that the introduction of the unconstitutionally obtained statements was harmless.

"[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). That is, "the beneficiary of a constitutional error [must] prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. *Id.*[6]

The trial transcript makes it clear that the main evidence against Fleming relied upon by the prosecutor was his admission to Officer Montgomery that he was involved in the bank robbery. It was well established at trial that the security guard shot Fleming on his way out the door. That fact was proved by Fleming's statement that fell under the *Quarles* exception, as well as the bank guard's own testimony and identification of Fleming. There was little evidence, however, actually tying him to the robbery. The guard did not testify as to why or how he concluded that Fleming was one of the robbers. Instead, he only stated that he saw him go toward the man who had been involved in the confrontation with the guard and then saw him run for the door. No other witnesses even testified to Fleming's presence in the bank during the robbery. He could have been running from a perilous shooting situation.

The only other evidence connecting Fleming to the robbery was that he was the brother-in-law of his co-defendant, David Ratley. Most of the trial testimony focussed on Ratley's connection to the robbery. Three men were seen walking into the bank together, one of whom was identi-

**6.** In determining that there was no harmless error in this case, the district court cited this court's opinion in *Germany v. Estelle*, 639 F.2d 1301 (5th Cir.), *cert. denied*, 454 U.S. 850, 102 S.Ct. 290, 70 L.Ed.2d 140 (1981). In that case, we stated the *Chapman* rule and then followed one of our earlier cases on harmless error that

held that, after reviewing the facts of a case, the evidence adduced at trial, and the impact the constitutional violation had on the trial process, "[a] court must then decide whether, absent the so-determined unconstitutional effect, the evidence remains not only sufficient to support the verdict but so overwhelming as to establish the guilt of the accused beyond a reasonable doubt."

*Germany v. Estelle*, 639 F.2d at 1303 (quoting *Harryman v. Estelle*, 616 F.2d 870, 876 (5th Cir.) (en banc), *cert. denied*, 449 U.S. 860, 101 S.Ct. 161, 66 L.Ed.2d 76 (1980)).

The *Harryman* articulation of the harmless error standard has been stated by this Court in some cases. *See, e.g., United States v. Bentley*, 875 F.2d 1114, 1117–18 (5th Cir.1989); *United States v. Watkins*, 741 F.2d 692, 695–96 (5th Cir.1984); *Demps v. Wainwright*, 666 F.2d 224, 226–27 (5th Cir. Unit B), *cert. denied*, 459 U.S. 844, 103 S.Ct. 98, 74 L.Ed.2d 89 (1982). More

often, however, we have stated and applied the original wording of the *Chapman* rule. A number of recent cases exemplify our commitment to the *Chapman* language. *See, e.g., United States v. Norris*, 910 F.2d 1246 (5th Cir.1990); *Charles v. Smith*, 894 F.2d 718, 726–27 (5th Cir.1990); *Brown v. Butler*, 876 F.2d 427, 430–31 (5th Cir.1989); *United States v. Dotson*, 817 F.2d 1127, 1135 (5th Cir.1987), *vacated in part on other grounds*, 821 F.2d 1034 (5th Cir.1987) (restating and applying same harmless error standard to an originally rejected claim). The Supreme Court also has remained committed to *Chapman* over the years. *See, e.g., Satterwhite v. Texas*, 486 U.S. 249, 108 S.Ct. 1792, 1798–99, 100 L.Ed.2d 284 (1988) (reversing a sentence of death because, even though a lot of corroborating testimony was offered on the issue of future dangerousness, it was "impossible to say beyond a reasonable doubt that [certain expert testimony] on the issue of Satterwhite's future dangerousness did not *influence* the sentencing jury") (emphasis added).

Although we state and apply the *Chapman* standard to Fleming's case, we note that our result would not be different under any standard articulated by this court. The evidence is not so overwhelming as to establish guilt beyond a reasonable doubt.

fied as Ratley. The state contended that Fleming must have been one of the others.

The statements Fleming made to Officer Montgomery formed the core of the state's case against him. The closing arguments best evince that fact. Two prosecutors presented closing statements to the jury. Together, they relied upon his answer to the critical question as an admission of guilt. The first one reviewed the testimony of the witnesses one by one. As he went through the first few witnesses, he suggested through very shaky circumstantial evidence that Fleming was involved.[7] Then he turned to Officer Montgomery's testimony and characterized it as follows:

> We bring you Officer Jan Montgomery. Tells you she was dispatched on a silent alarm. She goes out there and at that time, Fleming is in the field and he has been shot. Now what does he say? Words from his own mouth. "The guard shot me." I have been involved in a robbery, but please don't shoot me. I have thrown my gun down. Right out of his own mouth.

The remainder of his closing argument focussed on Ratley.

So strong was this evidence against Fleming that one of the defense attorneys spent a large portion of his closing argument attempting to discredit it. He also encouraged the jury to require some corroboration for the statements since "taken alone, those statements are incriminating. They're difficult to deal with."

The second prosecuting attorney also placed great emphasis on Fleming's statements to the officer, particularly on his admission of involvement. Responding to the defense attorney's attempt to discredit Montgomery, she responded:

> He says, "Don't consider what Joe Freddie Fleming says out in the field to Jan Montgomery." Don't shoot me. I robbed the bank. I threw my gun away. Don't shoot me, he says. He would say anything because he had been shot, and I say this to you. If you are an innocent person and you were in a bank in Dallas and you had just walked into the door and somebody had shot you and you run out and get shot again and you see the Dallas police there, are you going to say, "Don't shoot me. I robbed the bank." No, you're going to say, "Don't shoot me. Don't let somebody shoot me. I haven't done anything." That's not what Joe Freddie Fleming said. Fleming was yelling, "Don't shoot me. I threw my gun away," because he knew that when that bank robbery went sour there were people trying to kill him and it was going to be justifiable. That's why he threw his gun away and that's why that was the first thing that came out of his mouth. I have robbed the bank and I have thrown my gun away. Don't shoot me.[8]

Later, the prosecutor emphasized her belief in the credibility of Montgomery's testimony: "[Jan Montgomery] told you what Fleming said. She told you the truth; I submit to you. You saw her. You judge her credibility." The prosecution relied on those statements to such a great extent that, when the co-prosecutor turned to a discussion of Fleming's co-defendant and the circumstantial evidence connecting him to the robbery, she contrasted that circumstantial evidence with the direct evidence against Fleming (i.e., his admission). In explaining the circumstantial evidence charge, she began: "Now, the circumstantial evidence charge says that you must exclude any other reasonable hypothesis raised by the evidence. Number one, is there another hypothesis as to who the

---

7. He pointed, for example, to a witness who claimed she saw two men in a car near the robbery scene, one in the front seat and one in the back seat. The windows were foggy. The prosecutor deduced from that testimony that there were three people in the car, Fleming and the other two alleged robbers. He reasoned that there had to have been three people, not two, in the car "because you don't sit in a closed parking lot at 1:00 o'clock—or the closed parking lot of a closed restaurant at 1:00 o'clock in the afternoon with one person in the front seat and one person in the back seat. That doesn't make any sense."

8. According to Montgomery's testimony, of course, these were not the first words out of Fleming's mouth. Indeed, he never said, "I have robbed the bank."

robber was that got away. We are not talking about Fleming. We know we got Fleming." The prosecution, then, relied heavily on this "direct" evidence against Fleming.

Given the obvious centrality of Fleming's admission to his conviction, we cannot find it harmless. If there had been no particular reliance upon the critical question and response there could be at least a substantial argument supporting harmless error. But what is crucial and controlling is that the prosecution based its justification for conviction largely upon the unconstitutional question and petitioner's response. The core of the argument was that he admitted his guilt at that time. It is impossible to say beyond a reasonable doubt that the introduction of Montgomery's statement of participation in the robbery, unconstitutionally elicited, did not contribute to the jury verdict.

## CONCLUSION

The prosecution relied heavily upon the admission (which adequately served as a confession) in its case. The case was extremely weak without it. The error, therefore, could not be harmless.

The admission was obtained at gunpoint by a police officer while the unarmed accused was lying on the ground and suffering because he had been shot a few minutes before and no warning of any kind as to his rights had been given.

The combination of these two circumstances must lead to the conclusion that Fleming's trial violated due process of law and habeas corpus.

REVERSED; WRIT OF HABEAS CORPUS GRANTED.

JOHN R. BROWN, Circuit Judge, concurring:

Despite the persuasive power of Judge Jones' dissent, I concur in Judge Williams' opinion. I place strong emphasis on the startling facts as stated in the Court's conclusion.

If the use by the prosecution of the admission was error, it could not be harmless error. The government's case was based mainly upon the admission which amounted to a confession.

Further, the actual circumstances leading to the admission were intensely coercive. I stress it was obtained at gunpoint by the police officer while the unarmed accused was lying on the ground suffering from a bullet wound. No warning at all of his rights had been given to him.

EDITH H. JONES, Circuit Judge, dissenting:

Although I recognize the force of the majority's harmless error analysis, I would not proceed so far, because I believe this case falls comfortably within the *Quarles* public safety exception to *Miranda*. I must therefore respectfully dissent from the majority's contrary holding.

There are two reasons for my conclusion.

First, the facts seem to indicate that public safety was a serious concern for the arresting officers. They apparently knew that a bank robbery was attempted and that at least one suspect had escaped. They found Fleming, wounded and at the gunpoint of an unidentified individual, at some distance from the robbery. Several questions must have been running through the officers' minds at the same time: was one of these men involved in the robbery? If so, which was the victim? Could they be involved in an altogether different altercation? Could Fleming, indeed, have been the hostage of the man who was holding the gun?

To answer these questions, the officer had to interrogate Fleming very quickly. In my view, it matters not that Fleming was not in possession of a gun. For all the officers knew, Don Adams (the gun-toting citizen) could have taken Fleming's gun or could have been the criminal. Thus, on the facts, public safety dictated the officer's getting to the bottom of this ambiguous situation as quickly as possible.

Second, *Quarles* lays heavy emphasis on the exigent circumstances that mandate a

*Miranda* exception, while at the same time recognizing that police officers may have mixed motives in interrogating a suspect in such a position. The Court states:

> In a kaleidoscopic situation such as the one confronting these officers, where spontaneity rather than adherence to a police manual is necessarily the order of the day, the application of the exception which we recognize today should not be made to depend on *post hoc* findings at a suppression hearing concerning the subjective motivation of the arresting officer. Undoubtedly most police officers, if placed in Officer Kraft's position, would act out of a host of different, instinctive, and largely unverifiable motives—their own safety, the safety of others, and perhaps as well the desire to obtain incriminating evidence from the suspect. 467 U.S. at 656, 104 S.Ct. at 2631.

Further, *Quarles* suggests that parsing the precise contents of a conversation in these circumstances is dangerous, because at the point that the courts say that *Miranda* warnings were required, there is a threat that the dangerous situation will not have been resolved. Thus:

> We decline to place officers such as Officer Kraft in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the *Miranda* warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them. 467 U.S. at 657, 104 S.Ct. at 2632.

This reasoning would seem to govern the entirety of a dangerous situation until the police have decided which suspect to arrest.

The majority essentially conclude that *Miranda* warnings had to be given in the midst of armed confrontation, when any unfortunate delay or misunderstanding could have provoked immediate bloodshed. *Quarles,* quite sensibly, compels the opposite conclusion. The police should be entitled to neutralize the danger before *Miranda* takes hold. I dissent.